UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

       Plaintiffs,                Case No. 23-CR-69-WMC

-vs-

ERIC UPCHURCH,                    Madison, Wisconsin
                                  August 30th, 2024
       Defendant.             1:08 p.m. - 2:07 p.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF SENTENCING HEARING
HELD BEFORE U.S. DISTRICT JUDGE WILLIAM M. CONLEY

APPEARANCES:

For the Plaintiffs:
        United States Attorney's Office
        BY:  CHAD ELGERSMA
            WILLIAM LEVINS
        222 West Washington Avenue, Suite 700
        Madison, Wisconsin 53703

For the Defendant:
        Jones Law Firm
        BY:  WILLIAM JONES,
        P.O. Box 44188
        Madison, Wisconsin 53744

PHILIP C. HARRELSON, RMR, CRR
United States District Court Reporter
120 North Henry Street
Madison, Wisconsin 53703
1-608-261-5708
***

1          (Proceedings called to order at 1:08 PM.)

2          THE CLERK:  The Unites States District Court for the Western

3     District of Wisconsin is now in session.  District Judge William

4     M. Conley presiding.  Please be seated and come to order.

5          Case No. 23-CR-69-WMC, *the United States of America versus*

6     *Eric Upchurch*, called for sentencing.  May we have the

7     appearances please.

8          MR. ELGERSMA:  Good afternoon, Your Honor.  Chad Elgersma

9     and Max Levins for the United States.  We're joined by special

10    agent Sarah McCarron from the IRS criminal investigations.

11         MR. JONES:  Mr. Upchurch is here in person and with his

12    attorney, William Jones.  Good afternoon.

13         THE COURT:  Good afternoon, all.  We are here for the

14    sentencing of Eric Upchurch.

15         And, Mr. Upchurch, I'll begin by just asking you directly

16    whether you've had an opportunity to read and discuss with your

17    counsel the presentence report, the addendum to the report, and

18    the revised presentence report.

19         THE DEFENDANT:  Yes, I have, Your Honor.

20         THE COURT:  And secondly as a preliminary matter, I want to

21    confirm that the operators are in agreement that the forfeiture

22    order in the form of a money judgment is appropriate and that I

23    should proceed to enter the money judgment for $406,211.

24         MR. JONES:  No objection.

25         THE COURT:  Very good.  And that will be dated today and

entered into the record.

MR. JONES:  Judge, I should say "preserving all appeal rights," but no objection --

THE COURT:  Yeah, I'm --

MR. JONES:  -- at this stage.

THE COURT:  Absolutely.  I don't mean to intend --

MR. JONES:  Thank you.

THE COURT:  -- otherwise.

The defendant did exercise his right to trial.  So there's no plea agreement in this case.

In determining a reasonable sentence, I will take into consideration the advisory sentencing guidelines, but be bound by the statutory purposes of sentencing set forth at Section 3553 sub.(a) of Title 18.

As for the guidelines, the government offered two objections to the presentence report -- the original report.  First, the government objected that the total loss amount should include an additional $400,378 in loans that the defendant attempted but failed to receive, and the probation office agreed.  Because Application Note (3)(a) of Section 2B1.1 indicates that the loss amount is the greater of the actual loss or intended loss, I will sustain this objection.  In this case, the intended loss is $806,589.

Second, the government objected that the defendant's guideline calculation should reflect an "obstruction of justice"

component, having falsely testified under oath that his business used the accrual method of accounting when, in fact, he used the cash method. Again, the probation office agreed and applied the two-level upward adjustment for obstruction of justice under Section 3C1.1 in the revised report. While a close question, because the defendant repeatedly pushed the envelope in his testimony as to why he acted as he did, I will deny this objection, finding the testimony did not cross the line to obstruction.

For his part, the defendant objected that a two-level downward adjustment for acceptance of responsibility was not applied, and I also overrule this objection. The defendant put the government to its burden of proof at trial, denied the essential elements of guilt, and offered no truthful admissions regarding the offenses of conviction in any capacity. To the contrary, he told an incredible story as to his supposed good faith in applying for PPP funds when he surely knew or should have known that he had crossed the line into fraud, both as to his representations as to his company's monthly payroll, the company's revenue, and the company's profits, which were simply false.

With one exception, therefore, I find that the probation office calculated the advisory guidelines correctly and the revised presentence report using the current manual, and taking into account all relevant conduct under Section 1B1.3, consistent

with the grouping rules under Sections 3D1.1 and 1.3, Counts 1 through 12 are grouped together for calculation of the guidelines.

Section 2B1.1 applies because it results in the higher offense level when considering Counts 1 through 11 with Count 12 used as an adjustment to those first 11 counts. Specifically, the base offense level is 7 under subsection 1.1 sub.(a)(1) because defendant was convicted of offenses that have statutory maximum terms of imprisonment of 20 years. As discussed, the revised loss amount exceeds $550,000, which results in a 14-level increase under subsection 1.1(b)(1)(H).

As for Count 12, the defendant transferred 20,000 -- approximately 20,000 of fraudulently obtained PPP money to a Bitcoin account and then purchased $19,000 of Bitcoin. Accordingly, a two-level increase applies under subsection 1.1(b)(10)(C) because this offense involved defendant's intentionally engaging in and causing conduct amounting to sophisticated means.

No other Chapter 2 adjustments apply, and because the defendant put the government to its burden of proof at trial by denying the essential elements of guilt, no adjustment for acceptance of responsibility is warranted under Section 3E1.1; although the defendant does meet the criteria under Section 4C1.1(a)(1) through (10), entitling him to a two-level reduction as a zero-point offender.

With a total offense level of 21 and a criminal history category of I, the defendant therefore has an advisory guideline imprisonment range of 37 to 46 months.

I occasionally, as in this case, am confronted with starkly different positions in the sentencing memorandum by the government and defense counsel. Indeed, if you read just the government's sentencing memorandum, you would think we were dealing with Public Enemy No. 1. The government seems not to acknowledge that the SBA and many lenders were throwing money out the door. The SBA, because they were understaffed; the lenders, because, frankly, they had no skin in the game. They were going to be reimbursed by the government for any money that was provided.

That doesn't excuse the defendant from taking advantage of that situation by presenting false documents and obtaining money, but he is one of many that did that. He has no meaningful criminal history. And contrary to the government's description, I don't find him -- even his presentation -- to be more than overzealous is not necessarily a criminal intent nor do I view him as a risk of offending again. What I do view him is as someone who committed fraud on the government and who is going to have to pay a penalty for that. Part of it in prison.

And that's where we get to the -- the facts, sadly at this point, where the defendant still does not appear to have really accounted for the $400,000 that he did have, since he's taken the

position that he didn't do anything wrong, just simply pushed the envelope of the program.  I don't know that there's been any effort to account for most of the money that he received.

The government wants to emphasize the 19,000 in Bitcoin, which is certainly not a good fact for the defendant, but there is certainly reason to believe that some of that money was used to ongoing programming.

The defendant is a bright, talented, charismatic local leader as well as friend and father.  The many letters written on his behalf demonstrate that he is a contributor to our -- to our community and particularly to minors in minority groups within our community, and the government's memo doesn't really seem to acknowledge that at all.

On the other hand, he broke criminal laws by repeatedly lying to government officials about the amount of his various companies' payroll earnings and profits.  Even if intended to be used for a nobler cause, it's still classic white-collar crime, and it's painful that it's a young talented black man that's before me, but he is before me for classic white-collar crime, and whatever contributions he's made to the community don't free him from the consequences through the Court.

The main reason for imposition of a period of incarceration is that I'm sending a larger message about white-collar crime. And the guideline ranges for white-collar crime that the defendant benefits from are substantially lower, for the most

part, than the crimes that other defendants face under the guideline range, which I'm required to at least consider.

What the sentence should be I'm still not decided. I'm happy to hear other comments from counsel, but I can tell you that it's not two months, as suggested by defense counsel, and it's not almost five years, as suggested by the government.

Anything else that you want to add, Mr. Elgersma?

MR. ELGERSMA: One thing, Your Honor. The government is going to rest on the reasons set forth in its memo, but it's going to adjust its recommendation, based on your new guideline calculation. It's recommending 46 months.

THE COURT: And with that, Mr. Jones, I'm happy to hear anything else that you want to add.

For the benefit of everyone who's here, I have read the government's sentencing memorandum, the defendant's sentencing memorandum. I've -- take issue with some of both.

I've also read, with some care, the many letters written on behalf of the defendant that substantiate something that was also provided in testimony at trial, which is the defendant has done good things in our community -- particularly for minority youth, but for others. He hasn't profited substantially, unless he's squirreled away $400,000 and not used it. It seems like -- more likely than not that most of that money did go into further programming -- whether it was ill-advised, I don't know -- but I do appreciate those people who are appearing in support today for

the defendant and appreciate the work that he's done in the community, which, in my mind, is an offset to his crime here, but it doesn't change the fact that he engaged in a substantial fraud, and there is a consequence for that.

Mr. Jones, anything that you'd like to add?

MR. JONES: Thank you, Judge.

I think it behooves me to first address your finding on the guidelines. I know at the end, you typically ask if I've -- if you've addressed all of my -- the issues I raise, and I do feel that the record is incomplete as it relates to the intended loss. I don't accept the PSR's --

THE COURT: I saw your objection. I read it.

MR. JONES: Okay.

THE COURT: I just don't agree with you. I think it's -- there's no question that had the banks not stopped his applications -- that your client would have and did intend to obtain an additional $400,000, roughly, of additional money.

MR. JONES: Okay.

THE COURT: And it was an intended loss.

Now, you've made your objections --

MR. JONES: Thank you.

THE COURT: -- and I've formally overruled it as I discussed the guidelines. If you think you need to make some other record, you're welcome to do so, but certainly the -- the objection stands, and it's something that you can pursue on appeal.

1    MR. JONES:  I don't think any -- any further comment needs

2    to protect the record on that.  So I appreciate it.

3    Now, moving on.  You -- a great deal of your observations

4    suggest to me you've read my sentencing memo with great thought,

5    and I don't -- I don't need to repeat all the things, because

6    it's kind of what I was prepared to say as it relates to the 3553

7    factors, as it relates to his personal characteristics.  I think

8    you summarized greatly that -- that he has, you know, lived

9    admirably in the community and developed really positive

10   connections with a network of people that are trying to make

11   positive change in Madison.

12   I agree that a big part of this sentencing will relate to

13   general deterrence, and it's tough to identify what impact that

14   has on -- in the future.  We have statistics of how long a person

15   spends in prison as it relates to recidivism, but it's actually

16   how it impacts people's decisions --

17   THE COURT:  I --

18   MR. JONES:  -- we may not know.

19   THE COURT:  I'll just make clear:  You're right.  If we had

20   certainty of individuals being caught and primacy -- that is,

21   that they're caught quickly -- sentences would have much more

22   dramatic impact; although, for those acting with drug addictions

23   and other things, the data doesn't really support, even then,

24   that there's likely much impact.  Although, there would be

25   probably from the people who are supplying large amounts of

drugs.

The data is better with respect to white-collar crime. Not all white-collar crime is committed by people who make calculated decisions, but a lot of it is. And by sending a message that there is a consequence -- albeit, not as certain or immediate as it should be, and certainly the government could be doing a better job of sweeping a wider net of people who committed these -- these frauds -- there is reason to believe that people are more cautious and will not paint outside the lines, much less lie about their moneys, if they understand there is a consequence, including time in prison. And particularly for white-collar defendants, time in prison. Because if it's just a money penalty, many of them will pay that penalty and just view it as a cost of doing business.

MR. JONES: And I agree with that. What I was getting at is more will six months in prison be more compelling than -- if they hear Mr. Upchurch's story, will a six-month sentence in prison be more compelling than a one-year -- or less compelling than a one-year --

THE COURT: They don't just hear your client's background. They see the amount of time associated with fraud. And because fraud was rampant in this program, it is important to send that message. You and I both know that there isn't even really reporting anymore about the underlying basis for a sentence. So while I certainly am considering it in arriving at an appropriate

1       sentence in this case --

2            MR. JONES:  Mm-hmm.

3            THE COURT:  -- as the factors require and as the guidelines

4       also require, there is something to be said for a straightforward

5       message of incarceration, and there is a difference between --

6       certainly a difference between what the government is advocated

7       and what you had advocated.

8            MR. JONES:  Sure.  I mean, I agree with everything you've

9       said -- that if a white-collar criminal is considering accessing

10      government benefits and misrepresenting certain things, and they

11      know they could -- they could be dealing with going to prison

12      versus community supervision, that will change -- that might

13      change their mind.  I think that will have a deterring effect.

14           THE COURT:  And in fairness, six months versus years also

15      might change their mind.

16           MR. JONES:  I just don't know.  It would be reasonable to

17      think that.

18           THE COURT:  I'm operating on what little information we

19      have, and I'm -- I mean, I would be throwing out the statutory

20      factors if I didn't at least credit that possibility.

21           MR. JONES:  Speaking of the statutory factors -- we've gone

22      over his personal characteristics, and I think they're -- they

23      have a lot of positives.  And as it relates to deterrence, we've

24      had that discussion.  I don't think something lengthy, perhaps

25      higher than six months, would be -- would have any bigger general

deterrence effect. It's just people hearing his story that he did ultimately go to -- he did -- he did receive a prison sentence.

As far as --

THE COURT: And we just disagree about that, but I understand your point.

MR. JONES: As it relates to, for instance, protecting the community -- I -- I just don't think that separating Mr. Upchurch from his young son will promote respect for the law, which is another element or --

THE COURT: And I am concerned about that, as I always am when a father is separated from his children, and particularly where in the -- like in this case, where he has apparently been an exemplary father -- albeit, not in the same community all the time -- he spends inordinate amounts of time with his son, and I'm -- it's part of the tragedy of any criminal case that there is -- I don't even want to say it's "collateral fallout," because how can you describe a father/son relationship as "collateral," but it's an impact that I weigh in arriving at a sentence. And I agree with you that it is a mitigating factor, particularly in this case where the defendant has been, by all accounts, a good father.

MR. JONES: And -- and I think it's directly tied to the statutory sentencing factors promoting respect for the law that --

THE COURT:  That's where I --

MR. JONES:  That did --

THE COURT:  I guess I --

MR. JONES:  -- send a message.

THE COURT:  -- I just hope that -- I hope that that's not the message that's taken away.  A couple of people wrote in particular about -- and it's -- to me, it's the saddest part about this -- a young black man who has the abilities that this young man has, being yet another sent to prison.

And to the extent that there are those in the community who feel that's a sign of racism -- I know this jury, who was all white, was traumatizing for at least one of the people who wrote, and I'm an old white guy.  So that could be potentially traumatizing, and people will draw whatever view they have as to what was motivating here, including the prosecution itself, but this was a straightforward fraud.

Whatever else your client may have talked himself into about the argument available to obtain money in this program -- he flat-out lied repeatedly in his application.  And white or black, that's what happened.  And while I am certainly cognizant of the penalty that others are going to pay, including the community and young minority members of the community who benefited and will hopefully, in the future, benefit from the defendant's work, I can't ignore the crime.

MR. JONES:  Well, that was my last point, and that was -- he

is a unique defendant in a -- this case, because he can serve as
a deterrent factor the sooner he is out of prison, because I
think his message will be --

THE COURT:  Well, and --

MR. JONES:  -- spread.

THE COURT:  -- in prison.  And I don't mean to be
pollyannaish, but this defendant may be an important
representative of not just his community and the efforts he's
making for his community, but the larger community.  And that can
occur in prison as well as out of prison.

MR. JONES:  Well, I -- I appreciate the opportunity to speak
and your thoughts, and -- but really who I think you may like to
hear most from is Mr. Upchurch, and I know he's waiting for his
opportunity to -- to express how he feels about this and --

THE COURT:  Mr. Upchurch.

MR. JONES:  That's all I have to say.  Thank you.

THE COURT:  I would be very happy to hear from you,
understanding that I heard from you on the stand in the trial as
well.

THE DEFENDANT:  Thank you, Your Honor.

Yeah, I am in acknowledgment of the tragedy that you have
expressed, and I understand that it's my representation's
motivation here to make sure that he does his job well, and I
also understand that it's the government's motivation -- they
have their reasons for pushing for higher sentencing, but what

has stood out for me has been your motivation.  And I, of course,
can't understand all of that, but what I can understand is I know
a part of that is in deterrence of my future behavior and
deterrence of --

THE COURT:  Not of your future behavior, but of others --

THE DEFENDANT:  Understood.  Understood.

THE COURT:  -- who will be faced with the same temptations
for programs -- government programs offering money, seemingly
without restriction, and there are restrictions.  And when you
lie on forms, there is a consequence.

THE DEFENDANT:  Thank you for that.

I -- I would say that this has been a -- I did not know that
I was under investigation in 2020.  The federal agents showed up
at my house in February of 2022.  And when they did, that kind of
began a long, you know, two-and-a-half-plus-years journey of
waking up.  And the temptation that you're referencing is not as
obvious to people like me who are smart and passionate and bright
and may find themselves in need and see an opportunity somewhere,
and it's for that reason that I have been communicating and
sharing with others that my lesson here -- even though I stand by
my deeper intentions, you know, in terms of wanting to go good in
the community, the lesson that I learned was that I knew just
enough to be actually dangerous to people and to myself.

And that -- I do get and understand why things have
transpired the way that they have.  I've often been

misunderstood, but I say this to say that that intention is very
easily blinding. And if I see a sentence -- whatever that
sentence is, Eric two and a half years ago would not have felt
like that would have applied to me, because I spent time
convincing myself that I was following the rules, that there --
there was a way that this all worked out, you know, and that
there -- IRS guidelines and all sorts of different guidelines
that make this possible for me. And so that's the person that I
want to deter.

And to accomplish that, I had to speak to something that did
stand out, and that was this feeling that this was not -- there
is something about this that didn't feel right. There was
something about this that didn't feel like I could tell my
grandma about it and be proud, and that's -- that is the
deterrent that I feel is occurring now, and I -- I'd love to --
if I could have maybe two minutes, I'd love to read something --

THE COURT: Absolutely, yeah.

THE DEFENDANT: -- for you.

"For now, I want you all to know that life is crazy. We get
so worried about what people think, what people say. So much of
my actions then were based on fear -- fear of rejection, fear of
failure. Making decisions out of fear blinding me to the wisdom
in front of me. In hindsight, I probably wouldn't do the same
thing again, but it was so easy to justify, find the logic, and
navigate the gray areas.

"For a business that wanted me to coach their team, the product wasn't very honest.  It was a service dependent on convincing or representing a business as something it was not.  It was another loophole or another gray area.

"I needed to learn from my mistakes.  The whole reason I got into this crazy mess, the reason the FBI showed up, was because I thought that I had found a gray area or a loophole.

"The power of intent in navigating gray areas.  This chapter explores the significance of pure intentions when navigating complex and ambiguous situations illustrating how my initial motives and actions were grounded in the desire to help struggling businesses through loopholes and how those gray areas can create a liability.

"Struggle can inspire creativity that can help us.  Other times, it can cause us to compromise our values and create risks for ourselves.  When I first heard about the PPP, we were working on so many different projects, and my businesses were growing; but for all intents and purposes, I was still a struggling entrepreneur.

"It's like being drunk, drunk with the need and necessity of anger, of fear and frustration.  And just like being drunk with alcohol can skew your perceptions, being in dire straits can impact your mindset and perspective as well.  The beautiful thing about this type of intoxication is that it's very easy to overcome.  And the biggest part of that overcoming is in our

awareness."

Just a couple more here.

"I often talk about the importance of self-awareness and inside strategy.  For me, it was becoming aware of when I'm starting to get drunk, when those emotions and thoughts that steer my positive intent down a negative path.  It's all about self-awareness.

"When I heard -- when I first learned that this feeling was -- when I first learned about this feeling, I realize that it was saying something.  It was saying that there was something about the situation that didn't resonate with me that wasn't aligned.  That feeling was an opportunity for insightful questions, for self-inquiry, and for reflection, but how do we develop the muscle and the sensitivity to identify those gray areas?

"The grandma test.  If you ask anyone aware of those gray areas, you'll find that more times than not, they have a love/hate relationship with their gray area.  They have some internal or external struggle related to the choice to pursue a misaligned strategy or a process that doesn't really fit.  And one tool to overcome that is the grandma test.

"If I can't tell my grandma that this is something I'm up to and be proud, then there's something off.  And for you, it may be your grandmother or someone else that you admire or cherish, look up to or learn from or someone that you want to impact."

Lastly here. "Who we are is a choice we make with each of our actions. Perhaps if I had focused more on being in alignment, I might have made different decisions, including whether to apply for the PPP in the first place."

And -- and this section about maintaining integrity.

"Finding loopholes may seem temping, but it sets you up for challenges. Use this as an opportunity and a reminder to remain in unquestionable integrity. I understand now why some elders advocate for staying within clear, well-defined guidelines. If there is any room for error or gray area interpretation, seeking out documented legal advice can be -- that can be easily referenced will be a benefit to you in the long run.

"It's important to note that this book is not an attempt to win a case of public opinion --"

THE COURT: And when you say "this book," you're talking about your book --

THE DEFENDANT: Yes.

THE COURT: -- that you've been reading from?

THE DEFENDANT: Yes.

"-- or to vindicate myself. Rather it's my effort to share with the public -- to share the blessings that have come from my challenges -- both from my own growth and to be a source of hope and inspiration for others facing their own battles. I'm still very much navigating the repercussions and consequences of my actions. This book is written in the midst of that dark

struggle.  And despite all of it -- not just for me, but for you, the reader."

I'm reading from this book -- "Pure Intent" -- which was published earlier this week and has since become an Amazon best seller --

THE COURT:  And it was published by --?

THE DEFENDANT:  By Author Simon Media Group.  Technically, it's a self-publishing.

THE COURT:  Yeah, because I attempted -- I saw references to it.  I attempted to find, and I couldn't find reference to it.

THE DEFENDANT:  Yeah, it was only just published in -- on Monday or Tuesday.  So if you have searched then -- I don't know if it's appropriate, but I did bring a copy for you.

THE COURT:  I'd be happy to take it, but I don't think it's appropriate for me to take it from you.  I'll --

THE DEFENDANT:  Right now.

THE COURT:  I can always --

THE DEFENDANT:  Understood.

THE COURT:  -- get it --

THE DEFENDANT:  Understood.

THE COURT:  -- on Amazon.  No, not right now.  I don't think it's ever appropriate for me to take a gift from a party --

THE DEFENDANT:  Understood.  Well, it's there for you.

THE COURT:  -- in any -- in any circumstance, but I'm certainly interested, and I'll be interested to read it, and I

hope that you apply those lessons both during your incarceration and once you're released, and you can teach it to others. There are huge volumes of such books talking about -- not just criminal law. And, in fact, I used to lecture to large groups on antitrust criminal law.

THE DEFENDANT: Mm-hmm.

THE COURT: And the best way to emphasize to those people that they needed to listen was to explain to the people in the room who actually would consider criminal antitrust violations that people do go to prison.

THE DEFENDANT: Mm-hmm.

THE COURT: But yours is an important contribution to that, and -- and I'm glad that you've taken the time to make it, and there are business ethics courses that are now required in most --

THE DEFENDANT: Right.

THE COURT: -- major business schools, and I know you didn't graduate with a business degree, but you graduated from the University of Madison, which has a fine program of ethics in most of their schools. And had that stuck, I think you would have asked yourself, "Is this something that my grandmother would be proud of?"

THE DEFENDANT: Mm-hmm.

THE COURT: And never gotten close to the line. Unfortunately, you didn't just violate the grandma test. You

violated the criminal law, and you did so by blatant lying.  And
so how you portray it in that book -- whether I hope accurately
or not -- that's the real lesson.  And the part that I'm
struggling with is -- is with all the people who were supportive
of you, all the people who were in your sphere -- very successful
people -- how did you not have a mentor who taught you that
lesson before now?

THE DEFENDANT:  That's a great question, and I -- I want to
speak to -- I can -- can be and have been quite hard-headed in --
in many instances, and I've been advised that you're someone who
can see through inauthenticity and lies very quickly.

THE COURT:  You know, judges love to think that they have
that ability.

THE DEFENDANT:  Well, I --

THE COURT:  I think if -- by -- tests that are done by
psychologists were any better or worse -- in fact, sometimes --
some groups are worse because they think they have that ability.

THE DEFENDANT:  I feel that.

THE COURT:  What I -- what I know is what I hear and try to
understand.

THE DEFENDANT:  Right.

THE COURT:  And I do the best I can.  And I'm not sure where
this is going, but you don't have to presage it with any --

THE DEFENDANT:  Right on.

THE COURT:  -- assigning any great attributes on my part.

THE DEFENDANT:  Well, my -- in my experience, there -- there was just a moment -- and you might remember it very briefly -- a woman who was potentially going to be a juror -- she said something that gave you enough question to ask her to come to a sidebar and speak with you.  And in that dialogue, you helped her determine whether or not she should be -- she could be impartial.

THE COURT:  Yeah.

THE DEFENDANT:  And I think that takes -- that does take a level of certainty -- whether or not you're consistent in that, of course I don't know, but that has been my experience.

So I hope that I have communicated, at least that at some point, I did have some kind -- I convinced myself -- whether I convinced myself --

THE COURT:  I don't --

THE DEFENDANT:  -- it was genuine --

THE COURT:  -- doubt that you --

THE DEFENDANT:  -- that I did have belief.

THE COURT:  -- thought this was genuine.  You're too bright to have gone online and made a -- and actually taught others how to do something similar.  Where the government is -- departs from my view is that they viewed that as a statement that you knew you were working on a cash accrual, which I think you did, because you were working on cash in your accounting, but you were advocating for an accrual method in your submissions because you had this view of being able to claim from future -- anticipated

future profits and employment the ability to get compensation for past work, and that's where you really went off the rails.

THE DEFENDANT:  Yeah.

THE COURT:  And it's unfortunate that you did.

The reason I raise this question of mentorship is that something -- you seem to leave larger organizations behind.  You did some work for another entity that was large enough where they would have provided the kind of mentorship that would have helped you, and I'm wondering why, and maybe this is -- your answer is hardheadedness.

I had a brother who really didn't like to work for other people.  But you seem to be someone who could contribute so much to existing organizations doing good work in the community who would be provided resources in that role, but would do it in a situation where someone else was worrying about the accounting, someone else was concerned about the ethics, and you could focus on what you obviously do well, which is inspire young people and others to see their potential and to fulfill their potential, and I'm wondering why you didn't gravitate towards that because you have so many people -- not just here today -- but in the community who see your potential, and who I would have thought would have promoted that potential within the organization rather than going off on your own, where it's -- it's often the case that people flounder -- particularly small business flounder -- and are tempted to criminal behavior.

THE DEFENDANT:  Yeah.  To answer as transparently as I can, I think that mentorship -- looking up to successful people -- there's a desire to -- to learn from them and then also to emulate them, and I can recognize that now -- that there was a part of me that kind of wanted to show those mentors what I can do.  And not just the mentors, but people in the community -- you know, exes that I wanted to prove wrong and -- and differently.

And so there was also a deep frustration with continuing to fail, which is what it felt like to me.  It didn't feel like learning lessons, and, most importantly, I fell out of trust with that mentorship and -- and with my creator, honestly.  With God. I've -- I started to doubt that I would reach whatever heights people who look at me and -- and say "You're going to do some great things" -- I began to just completely doubt that.  And if it wasn't happening, I needed to make it happen by any means, and I think I slowly but surely lost touch with the clarity that comes from being pressed with such a challenge over the last couple of years.

So the mentorship was definitely there.  I am surrounded by good people.  Not -- of course, I wasn't bragging about PPP stuff in term- -- you know, to -- to all of them.  I wasn't saying, "Hey, I got X amount of dollars from the PPP."

THE COURT:  I wish you had because someone might have stopped you and said "How did that happen?"  when you didn't have employees to be compensated through the program.

THE DEFENDANT:  Right.  And I would --

THE COURT:  But --

THE DEFENDANT:  -- have just convinced them that --

THE COURT:  That this is available.  I know --

THE DEFENDANT:  Yeah.

THE COURT:  -- you -- you worked your way --

THE DEFENDANT:  Exactly.

THE COURT:  -- through the wormhole, and that's sadly where we are.

The reason I was raising it now was to encourage you when you come out, when you're going to have this additional hindrance to your success, which is going to be a conviction for a felony, there are going to be nonprofit entities that recognize your potential that are willing -- readily willing to look beyond a single criminal conviction and may help you learn the block and tackling, just like you're trying to encourage young people to see their -- the opportunity and to pursue their strengths.

I'm trying to encourage you to do the same within an organization that can foster you.  At your age, you still would benefit from that.  And rather than go off and create myriad separate corporations by yourself with volunteers and create the circumstances in which you feel it's out of control -- and, frankly, it was out of control -- focus on what your strengths are, what your mission is, find an organization that has the resources to fund it and pursue that when you get out because I

think you are capable of great things.  I just think that you
would have benefited -- and you still will benefit -- from
greater guidance -- not just someone who is a mentor in name or
in inspiration, but is doing the day-to-day mentoring that you'll
need to succeed, and you got some of that while you were in
school, but it doesn't seem like that continued.  And, at some
point, you went off on your own and floundered, and I hope you
don't do that again.

THE DEFENDANT:  Yeah, I agree.  I just want to add one quick
thing.  Regarding the sentencing, I know that your -- your, you
know, challenge -- that's your -- definitely your burden to
decide, and I know you will in your own authenticity.  I can't
speak to what would be a deterrent or not in the future, and I
know there's -- like you said, there's no data -- there probably
should be data, but --

THE COURT:  It's horribly frustrating the things we don't
know not only about --

THE DEFENDANT:  Yeah.

THE COURT:  -- sociologists, but when you start talking to
psychiatrists and psychologists, you really get frustrated.
So --

THE DEFENDANT:  I can imagine.

THE COURT:  -- the data is just not very good, but there is
data as to impact on decisions by white-collar criminals.

THE DEFENDANT:  And -- and with that being said, if there

1    has been any part of my conduct throughout this process -- I

2    remember something that stood out to me was you acknowledging

3    that conduct and -- and coming to shake my hand.

4        If there's been any part of my conduct that we want to

5    encourage in moments like these, I think that sentencing can also

6    encourage going through a process in the way that I did -- not

7    necessarily encourage the -- you know, criminal activity, but to

8    encourage a conduct that is cooperative and supportive and -- and

9    takes us seriously.

10    THE COURT:  And I can assure you that this would be an easy

11    sentencing but for those factors that I'm considering, including

12    your demeanor, including -- importantly, your performance over

13    the last year, including your contributions to the community, and

14    those are all mitigating factors because I generally, as both

15    sides would tell you, sentence towards the top of the guideline

16    range for a white-collar crime because the guideline ranges are

17    much lower than for other kinds of crime.  But I -- I am trying

18    to weigh all of those factors.

19        Unless there's anything else that you want to add, I am

20    prepared to render sentence.

21        Now, thirty- -- I thought it was 32 -- 36 years old, the

22    defendant is appearing before the Court for sentencing after

23    being convicted by a jury on five counts of wire fraud, six

24    counts of using false documents, and one count of engaging in

25    monetary transactions in property derived from wire fraud.

1    His illegal scheme was opportunistic, as he defrauded the

2    Small Business Administration's Pandemic Relief Program.

3    He comes from a loving and supportive family.

4    There was one thing I did mean to ask about.  There were a

5    couple of the letters that talked about hardship in your youth,

6    and I know that your parents traveled early on.  And so your home

7    sort of shifted as you were young; although, that ended by fourth

8    grade.  Was there some other hardship that isn't reflected in the

9    presentence report that -- that these people are referring to, or

10    do you have any idea what they're referring to?

11    THE DEFENDANT:  Possibly.  We were homeless when I was very

12    young, for a time, and --

13    THE COURT:  Part of their travels and --

14    THE DEFENDANT:  Yeah.

15    THE COURT:  -- and proselytizing.

16    THE DEFENDANT:  And also shortly after college, I was

17    homeless for a few years, and that's when I started to get into

18    community service and activism.

19    THE COURT:  Yeah, they were talking about in youth, but I --

20    I wasn't aware of other challenges.  In fact, by comparison to

21    most of the defendants I see, you've had a loving and supportive

22    family during your childhood; although, as I say, your parents

23    initially worked as peripatetic preachers working at various

24    churches across the country until eventually settling in

25    Milwaukee when you were in fourth grade.

There is no evidence of any childhood trauma, and the defendant performed well in school as a child, successfully graduating from high school.  Due to his positive academic performance in high school, the defendant was accepted into the University of Wisconsin in Madison, where he eventually graduated with a bachelor's degree.

While in college, he also passed counterfeit money on one occasion, resulting in a conviction in Dane County Circuit Court, but his criminal history consists of only one additional conviction in 2015 for resisting an officer at the State Capitol building as part of an otherwise peaceful protest.

In 2015 and 2016, the defendant worked as a development and marketing director for the YWCA in Madison.  After this employment terminated, the defendant established and ran various business entities with purported goals of promoting and supporting minority-owned businesses and providing life coaching to minorities.

On the surface, the defendant's work appears altruistic. Although, he obviously also hoped that his businesses would succeed.  To what extent the defendant and his businesses actually assisted others in the community is unclear; although, a number of individuals testified on his behalf, as have now people written on his behalf, describing the defendant's good intentions and positive impacts his work has had on the community -- especially on minority youth.

Still, the defendant has little to show regarding the financial or other success from his work. Apparently out of fear of failure in that work, the defendant sought to obtain numerous PPP loans for his various businesses by submitting false information that resulted in his crimes of conviction.

He ultimately received $406,211 in PPP loans and attempted to receive an additional $403,378 in loans based on misrepresentations of the facts.

The government has not recovered any of the money that was received, which defendant reports was spent on business expenses, including payouts to independent contractors, who he viewed as the equivalent of employees. Indeed, the defendant has not accepted responsibility for his crimes; although, he's made progress in that regard since trial. He mainly viewed himself as taking advantage of apparent loopholes in the PPP application process.

Nevertheless, the defendant falsified documents to fraudulently obtain loans for his various business entities. On the surface, his businesses appear to have social-justice goals and goals of supporting marginalized communities and minority owners. Regardless, the defendant falsified multiple documents to obtain PPP loans for those businesses and, aside from the fact of obtaining those loans and using part of that money for the $19,000 worth of Bitcoin that he purchased, the final destination of his proceeds are largely unknown, which is concerning and part

1    of what the Court has to consider as well.

2        Still, I do think that the defendant's overall efforts in

3    the community, his demeanor while in trial and before and, most

4    importantly, his conduct during supervised release leading up to

5    trial justifies some departure from the guidelines under Section

6    5K2.0.

7        Taking into consideration the nature of the offense as well

8    as defendant's personal history and characteristics, I am

9    persuaded that a custodial sentence below the advisory guideline

10   range is -- is reasonable and no greater than necessary to hold

11   the defendant accountable, protect the community, and achieve

12   parity with the sentences of similarly situated offenders who

13   defraud the government.

14       As to Count 1 through 12 of the superseding indictment, it

15   is adjudged that the defendant is committed to the custody of the

16   Bureau of Prisons for a term of 28 months on each count to run

17   concurrently with each other.  While defendant does not appear to

18   have specific programming needs, I recommend that he be afforded

19   access to all available programming, including advanced college

20   programming, and be afforded prerelease placement in a

21   residential reentry center with work-release privileges.

22       I also hope that the defendant take his goals into prison

23   with him and observe, first, the needs and then help address

24   needs of those he will be incarcerated with who are people of all

25   walks and color.

The defendant's term of imprisonment is to be followed by a three-year term of supervised release on each count to run concurrently with each other. In light of the nature of the offense and defendant's personal history, along with the statutory mandatory conditions of supervision, I -- I do adopt Conditions 1 through 16 as proposed and justified in the presentence report. I note that neither party objected to those conditions and that they are consistent with the goals of the Sentencing Reform Act of 1984.

Specifically, supervision will be necessary to monitor the defendant's employment, future entrepreneurial endeavors, and assure both legitimacy and dissuade any temptation to further criminal conduct. As importantly, they will be important to monitor the defendant making reasonable restitution payments.

The instant offense is not drug-related, nor does defendant appear to have a meaningful history of illicit substance use, as evidenced by a lack of any issues over the almost year of pretrial supervision; and, therefore, mandatory drug testing, as set forth at Section 3583 sub.(d) of Title 18, for supervision cases is waived.

I know that counsel are aware that there remains some question as to whether the Court is required to enter each of the conditions that have been proposed as well as justify the conditions individually. And so I will certainly do so unless the defense wishes to waive my doing so.

1    MR. JONES:  We've had a chance to go over the conditions in

2    the PSR.  He's aware of them as well as their justifications, and

3    we would waive that reading and does not need any further

4    justification for their implementation.

5    THE COURT:  I will emphasize for you, Mr. Upchurch, that

6    when you're getting close to release, you'll have an opportunity

7    to go through the conditions with the supervising probation

8    officer.  I think you've had a fairly straightforward

9    relationship with the officer beforehand, and I hope that will

10   continue upon your release.  But if either of you believe that

11   any of the conditions I impose today are no longer appropriate

12   upon your release, then you should discuss that, and either of

13   you may petition the Court for revision.  If it's submitted as a

14   joint petition, I'm likely to grant it without much further

15   adieu.

16   By statute, it is adjudged the defendant is to pay $100

17   criminal assessment penalty for each count of his conviction.

18   And here, that means he is adjudged to pay $1,200 to the Clerk of

19   Court for the Western District of Wisconsin, which is due

20   immediately following sentencing.  Failure to pay the assessment

21   may result in preclusion from certain programming while confined,

22   but you can avoid that, I think, by allowing a check-off, and I

23   would encourage you to consider that during your incarceration

24   for that purpose.

25   The defendant is also to pay mandatory restitution, as I've

already indicated, and enter it on the record in the amount of $406,211 to the U.S. Clerk of Court for the Western District -- excuse me -- for the Western District of Wisconsin to be disbursed to the victim, the Small Business Administration, at 1165 Herdon Parkway in Herndon, Virginia.  That information will be provided to the Clerk's Office for forwarding.

The defendant does not, however, have the economic resources to allow himself to make full payment of restitution in the foreseeable future under any reasonable schedule.  And so under Section 3664 sub.(f) sub.(3)(B) of title 18, he is to begin making nominal payments of a minimum of $200 each month beginning within 30 days of his release from custody.

The defendant shall notify the Court and the U.S. Attorney General of any material change in his economic circumstances that might affect his ability to pay restitution.  No interest will accrue on the unpaid portion of the restitution so that the defendant can make a meaningful dent in that sum.

Finally, the defendant does not have the means to pay a fine under Section 5E1.2(c) without impairing his ability to support himself, his minor child, and to pay restitution.  So I impose no further monetary fine in this case.

Unless the government wants to be heard, I also find that the defendant neither presents a flight risk nor a danger to the community, particularly given his conduct while on pretrial supervision.  And so execution of his sentence of imprisonment

will be stayed until September 27th, 2024, between the hours of noon and 2:00 p.m., when he is to report to an institution to be designated by further court order.

The present release conditions are continued until his surrender, and I just want to strongly encourage your continued compliance, because it will have an impact on where you're allowed to report.

The U.S. Probation Office is to notify local law enforcement agencies and the State Attorney General of the defendant's release back into the community.

As you know, Mr. Jones, I'm encouraged by the Seventh Circuit to ask whether I've sufficiently addressed the defendant's main arguments in mitigation.

MR. JONES:  Yes.

THE COURT:  And, also am obligated to advise you, Mr. Upchurch, that you have a right to appeal both your convictions and your sentence, and I'm certain that Mr. Jones would assist you in filing a notice of appeal if that's what you decide to do, but you only have 14 days to file the notice.  So that's a conversation you need to have sooner rather than later.

I'm most interested in what you do with your time in prison. One, what contributions you can make while there; and, two, what steps you'll start to take there to prepare yourself to launch again into legitimate work and purpose when you're released.  And if there's anything I can do to play a role in that, I'd be happy

1    to do so.

2        Is there anything more for the government at this time?

3        MR. ELGERSMA:  Nothing.  Thank you, Your Honor.

4        THE COURT:  Anything more for the defense?

5        MR. JONES:  No.  Thank you.

6        THE COURT:  Very good.  Good luck to you, Mr. Upchurch.

7    We are adjourned.

8        THE CLERK:  This Honorable Court stands adjourned.

9            (Proceedings concluded at 2:07 PM.)

10                ***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   I, PHILIP C. HARRELSON, Certified Realtime and Merit Reporter in and

2   for the State of Wisconsin, certify that the foregoing is a true and

3   accurate record, transcribed to the best of my ability, of the

4   proceedings held on the 30th day of August 2024, before the

5   Honorable William M. Conley, District Judge of the Western District

6   of Wisconsin, in my presence and reduced to writing in accordance

7   with my stenographic notes made at said time and place.

8

9

10

11

12                              Dated this 25th day of September, 2024.

13

14

15

16

17

18                              /s/Philip C. Harrelson

19                              Philip C. Harrelson, RMR, CRR
                                Federal Court Reporter
20

21

22

23

24

25   The foregoing certification of this transcript does not apply to any
     reproduction of the same by any means unless under the direct
     control and/or direction of the certifying reporter.